## THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| ALEXANDER HUN, on behalf of himself and all others similarly situated, | **CASE NO.: 19-cv-4436** |
| Plaintiff, | **DEMAND FOR JURY TRIAL** |
| vs. | |
| CAPITAL ONE FINANCIAL CORPORATION, and AMAZON WEB SERVICES, INC., | |
| Defendants. | |

## CLASS ACTION COMPLAINT

Plaintiff Alexander Hun ("Plaintiff"), on behalf of himself and all others similarly situated, allege as follows:

### NATURE OF THE CASE

1.      On July 29, 2019, Capital One Financial Corporation ("Capital One") disclosed that "[o]n July 19, 2019, we determined there was unauthorized access by an outside individual who obtained certain types of personal information relating to people who had applied for our credit card products and to Capital One credit card customers."[1]

2.      Further details regarding this breach can be found in a criminal complaint that has been filed in the Western District of Washington, titled United States of America v. Page A. Thompson, a/k/a "erratic," Case No. MJ19-0344 (W.D. Washington July 29, 2019) ("Criminal Complaint").

---

[1] https://www.capitalone.com/facts2019/2/ (last accessed on July 31, 2019).

3.      This is a data breach class action on behalf of approximately 100 million consumers whose personal identifying information ("PII") including dates of birth, names, addresses, Social Security numbers ("SSNs"), bank account numbers, credit history information, and other personal information (collectively, "Data") was taken in a cyber-attack from and later disclosed by Defendants Capital One and Amazon Web Services, Inc. ("AWS").

4.      The Data belonged to consumers who applied for credit cards from Capital One as well as individuals who had a Capital One Credit Card for the period 2005 through early 2019 and includes around 140,000 Social Security numbers and 80,000 bank account numbers.

5.      Defendants Capital One and AWS failed to adequately safeguard consumers' PII because they lacked proper safeguards to maintain security of Plaintiff's and Class Members' personal information.  Defendants' lack of reasonable security provided a means for unauthorized access to consumers' sensitive PII.

6.      Armed with this sensitive information, data thieves can open new financial or utility accounts in a victim's name; use the victim's information to obtain government benefits; file fraudulent tax return using the victim's information to obtain a tax refund; obtain a driver's license or identification card in the victim's name but with another person's picture; give false information to police during an arrest, amongst other things.

7.      As a result of the breach, Plaintiff and members of the Class (as defined below) are exposed to a heightened and imminent risk of fraud and identity theft and must now closely monitor their financial accounts to guard against identity theft well into the future. As a result, Plaintiff and Class Members may be faced with fraudulent debt, incur out of pocket costs for, among other things, obtaining credit reports, credit freezes, or other protective measures to deter and detect identity theft.

8.      Plaintiff seeks to remedy these harms on behalf of himself and all similarly-situated individuals whose personal information was accessed during the breach.

9.      Plaintiff seeks remedies including but not limited to statutory damages, reimbursement of out-of-pocket losses, further credit monitoring services with accompanying identity theft insurance, and improved data security.

## PARTIES

10.      Plaintiff Alexander Hun is a resident of New York City, NY, who applied for, and received, a credit card from Capital One, in the past four years.  Based on when he applied for the credit card, Mr. Hun's information was amongst the information disclosed in the Capital One breach.

11.      Defendant Capital One is a Delaware corporation whose headquarters is at 1680 Capital One Drive, McLean, VA  22102.  As noted in the Criminal Complaint, it is "a bank holding company that specializes in credit cards, but that also offers other credit including automobile loans, as well as a variety of bank accounts," and which "offers credit cards and other services to customers throughout the United States."

12.      Defendant AWS is a Delaware corporation which is a subsidiary of Amazon.com, Inc. ("Amazon").[2]  Amazon is a Delaware corporation whose headquarters is at 410 Terry Avenue North, Seattle, Washington 98109-5210.  AWS "is the world's most comprehensive and broadly adopted cloud platform, offering over 165 fully featured services from data centers globally. Millions of customers —including the fastest-growing startups, largest enterprises, and leading government agencies—trust AWS to power their infrastructure, become more agile, and lower costs."[3]

---

[2] *See* https://aws.amazon.com/solutions/case-studies/amazon/ (last visited July 31, 2019) (referencing "Amazon Web Services (AWS), a subsidiary of Amazon.com.")
[3] https://aws.amazon.com/what-is-aws/?nc1=f_cc (last visited July 31, 2019).

3

**JURISDICTION & VENUE**

13.     This Court has diversity jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d), because this is a class action involving more than 100 class members, the amount in controversy exceeds $5,000,000 exclusive of interest and costs, and many members of the class, including Plaintiff, are citizens of states different from Defendants.

14.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because Defendants regularly transact business in this District, and Plaintiff Hun and some of the class members reside in this District.

**FACTS**

**Capital One – Data Breach**

15.     The Federal Bureau of investigation has been conducting an investigation into whether Page A. Thompson, a/k/a "erratic" (Thompson) intruded into servers rented or contracted by Capital One "from a company that provides cloud computing services" (listed in the Complaint as "Cloud Computing Company") "and for exfiltrating and stealing information, including credit card applications and other documents, from Capital One."   Complaint at p. 2.

16.     The Criminal Complaint provides information linking Ms. Thompson with this intrusion. *Id.* at p. 2-3.

17.     On July 17, 2019, Capital One received an email from an individual (alleged to be Ms. Thompson) informing Capital One that there was data apparently leaked from Capital One available on the internet service GitHub.  Criminal Complaint, p. 5-6.

18.     The file with the leaked information available on GitHub was timestamped April 21, 2019 ("April 21 File").  Capital One also "determined that the April 21 File contained the IP address for a specific server."  Furthermore, "[a] firewall misconfiguration permitted commands to reach and

be executed by that server, which enabled access to folders or buckets of data in Capital One's storage space at the Cloud Computing Company." *Id.* at p. 6.

19.    Furthermore, "Capital One tested the commands in the April 21 File, and confirmed that the commands did, in fact, function to obtain Capital One's credentials, to list or enumerate folders or buckets of data, and to extract data from certain of those folders or buckets." *Id.* at p. 7.

20.    As alleged in the Criminal Complaint, "[a]ccording to Capital One, the data copied from Capital One's data folders or buckets includes primarily data related to credit card applications. Although some of the information in those applications (such as Social Security numbers) has been tokenized or encrypted, **other information including applicants' names, addresses, dates of birth and information regarding their credit history has not been tokenized.**" *Id.* at 8 (emphasis added).

21.    Furthermore, "[a]ccording to Capital One, the data includes data regarding large numbers of applications, likely tens of millions of applications.  According to Capital One, that data includes approximately 120,000 Social Security Numbers and approximately 77,000 bank account numbers." *Id.*

22.    The Complaint goes on to describe Ms. Thompson's involvement in the data breach. Specifically, "the GitHub address where the April 21 File was posted includes PAIGE A THOMPSON'S full name," and clicking on that address "takes the user to the main GitHub page" tied to her name.  A profile found on that page "contains a link to a GitLab page" that "includes, among other things, a resume for 'Paige Thompson,'" and "[t]hat resume indicates that Paige Thompson is a 'systems engineer' and formerly worked at the Cloud Computing Company from 2015-16." *Id.* at 8-9.

23.     Furthermore,    "[t]hat    resume,    available    on    Gitlab [at https://gitlab.com/netcrave/Resume/blob/master/cv/experience.tex], reveals Thompson's most recent employer was **Amazon Inc.**"[4]

24.     Additionally, FBI Special Agents later searched Ms. Thompson's residence, and "observed filed and items that referenced Capital One and the Cloud Computing Company, other entities that may have been the targets of attempted or actual network intrusions, and 'erratic,' the alias associated with PAIGE A. THOMPSON."  Criminal Complaint at p. 12.

25.     Ultimately, FBI Special Agent Joel Martini, the Complainant in the Criminal Complaint, claimed "that probable cause exists to believe that PAIGE A. THOMPSON has committed a violation of Title 18, United States Code, Section 1030(a)(2)."  *Id.* at 12.

26.     Furthermore, Capital One has acknowledged the data breach on its website. Specifically, it has announced that "[o]n July 19, 2019, we determined that an outside individual gained unauthorized access and obtained certain types of personal information about Capital One credit card customers and individuals who had applied for our credit card products," and that "this event affected approximately 100 million individuals in the United States."[5]

27.     Capital One further indicated that "[t]he largest category of information accessed was information on consumers and small businesses as of the time they applied for one of our credit card products from 2005 through early 2019," and indicated that "[t]his information included personal information Capital One routinely collects at the time it receives credit card applications, including names, addresses, zip codes/postal codes, phone numbers, email addresses, dates of birth, and self-

---

[4] *See* https://krebsonsecurity.com/2019/07/capital-one-data-theft-impacts-106m-people/ (emphasis in original).
[5] https://www.capitalone.com/facts2019/ (last accessed August 1, 2019).

reported income."  It further stated that, in addition to the "the credit card application data, the individual obtained portions of credit card customer data," which included "[c]ustomer status data, e.g., credit scores, credit limits, balances, payment history, contact information"; and "[f]ragments of transaction data from a total of 23 days during 2016, 2017 and 2018."  It also indicated that around 140,000 Social Security numbers and 80,000 linked bank accounts had been compromised.  *Id.*

28.    Capital One also posted an FAQ regarding the breach, which indicated that "[o]n July 19, 2019, we determined that an outside individual gained unauthorized access and obtained certain types of personal information about Capital One credit card customers and individuals who had applied for our credit card products. This occurred on March 22 and 23, 2019."[6]

29.    In response to the question, "Was the data encrypted or tokenized?,", Capital One responded,  **"**[w]e encrypt our data as a standard. Due to the particular circumstances of this incident, the unauthorized access also enabled the decrypting of data." *Id.*

30.    Finally, Capital One claimed that it would "notify affected individuals through a variety of channels." *Id.*  To date, however, no such direct customer notice has been provided.

### Capital One --Privacy Policy

31.    Capital        One's       Privacy       Notice       can       be       found       at: https://www.capitalone.com/privacy/notice/en-us/ (last visited August 1, 2019). It lists the "Reasons we can share your personal information," which include "For our everyday business purposes"; "For our marketing purposes"; "For our joint marketing with other financial companies"; "For our affiliates' everyday business purposes"; "For our affiliates to market to you" and "For our nonaffiliates to market to you."

---

[6] https://www.capitalone.com/facts2019/2/ (last accessed August 1, 2019).

32.     In response to the question, "How does Capital One protect my personal information?", it claims "[t]o protect your personal information from unauthorized access and use, we use security measures that comply with federal law. These measures include computer safeguards and secured files and buildings." *Id.*

33.     An accompanying FAQ[7] states:

> Capital One understands how important security and confidentiality are to our customers, so we use the following security techniques, which comply with or even exceed federal regulatory requirements to protect information about you:

> - We maintain physical safeguards, such as secure areas in buildings; electronic safeguards, such as passwords and encryption; and procedural safeguards, such as customer authentication procedures to protect against ID theft.

> - We restrict access to information about you to authorized employees who only obtain that information for business purposes.

> - We carefully select and monitor the outside companies we hire to perform services for us, such as mail vendors who send out our statements. We require them to keep customer information safe and secure, and we do not allow them to use or share the information for any purpose other than the job they are hired to do.

> - We train our employees on these security procedures, providing security awareness reminders and conducting regular audits to verify compliance.

34.     Capital One also claims that it "protects your Social Security Number," and that its policies and procedures "Protect the confidentiality of Social Security numbers;" "Prohibit the unlawful disclosure of Social Security numbers; and…Limit access to Social Security numbers to employees or others with legitimate business purposes."[8]

35.     None of these provisions permitted the unauthorized access and disclosure of PII, as has occurred in the applicable data breach.

---

[7] https://www.capitalone.com/identity-protection/privacy/faq. (last visited August 1, 2019).
[8] https://www.capitalone.com/identity-protection/privacy/social-security-number (last visited August 1, 2019).

**AWS – Privacy Policy**

36.    AWS also issues Privacy Notices, with the most recent being issued December 10, 2018, a copy of which can be found at https://aws.amazon.com/privacy/.   This Privacy Notice "describes how we collect and use your personal information in relation to AWS websites, applications, products, services, events, and experiences that reference this Privacy Notice." *Id.*  It lists the following uses for the personal information:

### How We Use Personal Information

We use your personal information to operate, provide, and improve AWS Offerings. Our purposes for using personal information include:

- **Provide AWS Offerings:** We use your personal information to provide and deliver AWS Offerings and process transactions related to AWS Offerings, including registrations, subscriptions, purchases, and payments.

- **Measure, Support, and Improve AWS Offerings:** We use your personal information to measure use of, analyze performance of, fix errors in, provide support for, improve, and develop AWS Offerings.

- **Recommendations and Personalization**: We use your personal information to recommend AWS Offerings that might be of interest to you, identify your preferences, and personalize your experience with AWS Offerings.

- **Comply with Legal Obligations:** In certain cases, we have a legal obligation to collect, use, or retain your personal information. For example, we collect bank account information from AWS Marketplace sellers for identity verification.

- **Communicate with You:** We use your personal information to communicate with you in relation to AWS Offerings via different channels (e.g., by phone, email, chat) and to respond to your requests.

- **Marketing:** We use your personal information to market and promote AWS Offerings. We might display interest-based ads for AWS Offerings. To learn more, please read our Interest-Based Ads notice.

- **Fraud and Abuse Prevention and Credit Risks:** We use your personal information to prevent and detect fraud and abuse in order to protect the security of our customers, AWS, and others. We may also use scoring methods to assess and manage credit risks.

- **Purposes for Which We Seek Your Consent:** We may also ask for your consent to use your personal information for a specific purpose that we communicate to you.

37. It further explains how it shares personal information:

**How We Share Personal Information**

Information about our customers is an important part of our business and we are not in the business of selling our customers' personal information to others. We share personal information only as described below and with Amazon.com, Inc. and the subsidiaries that Amazon.com, Inc. controls that are either subject to this Privacy Notice or follow practices at least as protective as those described in this Privacy Notice.

- **Transactions Involving Third Parties:** We make available to you services, software, and content provided by third parties for use on or through AWS Offerings. You can tell when a third party is involved in your transactions, and we share information related to those transactions with that third party. For example, you can order services, software, and content from sellers using the AWS Marketplace and we provide those sellers information to facilitate your subscription, purchases, or support.

- **Third-Party Service Providers:** We employ other companies and individuals to perform functions on our behalf. Examples include: delivering AWS hardware, sending communications, processing payments, assessing credit and compliance risks, analyzing data, providing marketing and sales assistance (including advertising and event management), conducting customer relationship management, and providing training. These third party service providers have access to personal information needed to perform their functions, but may not use it for other purposes. Further, they must process that information in accordance with this Privacy Notice and as permitted by applicable data protection law.

- **Business Transfers:** As we continue to develop our business, we might sell or buy businesses or services. In such transactions, personal information generally is one of the transferred business assets but remains subject to the promises made in any pre-existing Privacy Notice (unless, of course, the individual consents otherwise). Also, in the unlikely event that AWS or substantially all of its assets are acquired, your information will of course be one of the transferred assets.

- **Protection of Us and Others:** We release account and other personal information when we believe release is appropriate to comply with the law, enforce or apply our terms and other agreements, or protect the rights, property, or security of AWS, our customers, or others. This includes exchanging information with other companies and organizations for fraud prevention and detection and credit risk reduction.

10

- **At Your Option:** Other than as set out above, you will receive notice when personal information about you might be shared with third parties, and you will have an opportunity to choose not to share the information.

38.    It also described how it secures information:

**How We Secure Information**

At AWS, security is our highest priority. We design our systems with your security and privacy in mind.

- We maintain a wide variety of compliance programs that validate our security controls. Click here to learn more about our compliance programs.

- We protect the security of your information during transmission to or from AWS websites, applications, products, or services by using encryption protocols and software.

- We follow the Payment Card Industry Data Security Standard (PCI DSS) when handling credit card data.

- We maintain physical, electronic, and procedural safeguards in connection with the collection, storage, and disclosure of personal information. Our security procedures mean that we may request proof of identity before we disclose personal information to you.

39.    None of these provisions permitted the unauthorized access and disclosure of PII, as has occurred in the applicable data breach.

**Amazon Web Services' Connection to Capital One**

40.    AWS claims to be able to meet the security requirements in a number of fields, including banking.  "AWS has been architected to be the most flexible and secure cloud computing environment available today. Our core infrastructure is built to satisfy the security requirements for military, global banks, and other high-sensitivity organizations."[9]

---

[9] https://aws.amazon.com/what-is-aws/?nc1=f_cc (last visited July 31, 2019).

41.    It further claims that "AWS uses the same secure hardware and software to build and operate each of our regions, so all of our customers benefit from the only commercial cloud that has had its service offerings and associated supply chain vetted and accepted as secure enough for top secret workloads. This is backed by a deep set of cloud security tools, with 203 security, compliance, and governance services and key features," and that "AWS supports 85 security standards and compliance certifications, and all 116 AWS services that store customer data offer the ability to encrypt that data."[10]

42.    AWS also touts its operational expertise, claiming that it "has unmatched experience, maturity, reliability, security, and performance. AWS has been delivering cloud services for over 12 years to millions of customers around the world running a wide variety of use cases, and has the most operational experience, at greater scale, than any cloud provider." *Id.*

43.    It also indicates that "[y]ears of operating with many times the usage of any other cloud provider, combined with listening and learning from our customers and our commitment to constant iteration help us deliver superior operational performance that you can depend on for your most important workloads." *Id.*

44.    AWS further claims that it "provides a highly reliable, scalable, low-cost infrastructure platform in the cloud that powers hundreds of thousands of businesses in 190 countries around the world," and that it "is a secure, durable technology platform with industry-recognized certifications and audits…Our services and data centers have multiple layers of operational and physical security to ensure the integrity and safety of your data."[11]

---

[10]  https://aws.amazon.com/what-is-aws/?nc1=f_cc#operational-expertise (last visited August 1, 2019).

[11]  https://aws.amazon.com/about-aws/ (last visited July 31, 2019).

45.    Finally, it claims that it is "[t]rusted by over 1 Million Customers of All Types."[12]

**Relationship Between Capital One and AWS**

46.    There is no doubt that Capital One relies heavily on AWS.  For example, Capital One's most recently filed 10-Q, for the quarterly period ended June 30, 2019, indicates that it also relies "on the business infrastructure and systems of third parties with which we do business and to whom we outsource the operation, maintenance and development of our information technology and communications systems. We have migrated substantially all, and intend to migrate all, of our core information technology systems and customer-facing applications to third-party cloud infrastructure platforms, principally AWS."  It further notes that if Capital One does "not complete the transition or fail to administer these new environments in a well-managed, secure and effective manner, or if AWS platforms become unavailable for any reason, we may experience unplanned service disruption or unforeseen costs which could result in material harm to our business and operating results. We must successfully implement information, financial reporting, data-protection and other controls adapted to our reliance on outside platforms and providers."  It finally indicates that "AWS, or other service providers, could experience system breakdowns or failures, outages, downtime, cyber-attacks, adverse changes to financial condition, bankruptcy, or other adverse conditions, which could have a material adverse effect on our business and reputation. Thus, the substantial amount of our infrastructure that we outsource to the cloud or to other third parties may increase our risk exposure."

47.    AWS further highlights the nature of its relationship to Capital One on its website. AWS asks, "How did Capital One get to the point where, in 2015, it announced that all new company applications would run in—and all existing applications would be systematically rearchitected for—

---

[12] https://aws.amazon.com/what-is-aws/?nc1=f_cc#most-secure (last visited July 31, 2019).

the cloud? Although Capital One, a technology company that offers financial services, is different in important ways from other companies in its industry, its path to the Amazon Web Services (AWS) Cloud and its cloud-first approach to software development offers useful tips for large, non-cloud-native, highly-regulated enterprises mapping out their own cloud journeys."[13]

48.    That page also included a quote from Rajiv Sondhi, Capital One's Vice President, Software Engineering, who stated, "[e]ach call is a chance to live our mission of bringing simplicity, ingenuity, and humanity to banking. That mission is powered by our strategic use of technology. Our focus is on serving customers the way they want to be served. We are constantly researching new technologies, but we know our voice channel remains crucial for many customers and situations." *Id.*

49.    AWS further claims that "[t]o best understand Capital One and its long-term strategy, it helps to think of the company not as a bank—despite the fact that the diversified financial services company is, in fact, one of the ten largest U.S. banks by assets and deposits—but as a digital technology company that offers banking services."[14]  It further notes that "[a]t Capital One, the central motivating belief is that the winners in next-generation banking will be the companies that make the most creative and innovative use of technology to provide seamless, intelligent, truly excellent customer experiences.  That's why Capital One has a cloud-first policy, in which all new applications are architected for and deployed in the cloud, and that's why the company is using data analytics and machine learning to better understand customer feedback and intent.  It's also why the company

---

[13]  https://aws.amazon.com/solutions/case-studies/innovators/capital-one/?pg=WIAWS  (last visited July 31, 2019).

[14]  https://aws.amazon.com/solutions/case-studies/capital-one-amazon-connect/ (last visited July 31, 2019).

moved to Amazon Web Services (AWS) and deployed the Amazon Connect cloud-based contact center service." *Id.*

### Gramm—Leach--Bliley Act

50.    The Gramm-Leach-Bliley Act ("GLBA")[15] places upon financial institutions "an affirmative and continuing obligation to respect the privacy of its customers and to protect the security and confidentiality of those customers' nonpublic personal information." 15 U.S.C. § 6801.

51.    Pursuant to Section 6801(b) of the GLBA, to satisfy this obligation, financial institutions must satisfy certain standards relating to administrative, technical, and physical safeguards "(1) to insure the security and confidentiality of customer records and information; (2) to protect against any anticipated threats or hazards to the security or integrity of such records; and (3) to protect against unauthorized access to or use of such records or information which could result in substantial harm or inconvenience to any customer."

52.    Pursuant to 16 C.F.R. §§ 313.4 and 313.5, as well as 12 C.F.R. §§ 1016.4 and .5, financial institutions must also provide both initial and annual privacy notices to customers which are "clear and conspicuous."

53.    Furthermore, to comply with their obligations under the GLBA, financial institutions are required to "develop, implement, and maintain a comprehensive information security program that is [1] written in one or more readily accessible parts and [2] contains administrative, technical, and physical safeguards that are appropriate to [their] size and complexity, the nature and scope of [their] activities, and the sensitivity of any customer information at issue." See 16 C.F.R. § 314.4.

54.    With regard to their information security programs, financial institutions are also required to:

---

[15] 15 U.S.C. § 6801 *et seq.*

(a) Designate an employee or employees to coordinate [their] information security program.

(b) Identify reasonably foreseeable internal and external risks to the security, confidentiality, and integrity of customer information that could result in the unauthorized disclosure, misuse, alteration, destruction or other compromise of such information, and assess the sufficiency of any safeguards in place to control these risks. At a minimum, such a risk assessment should include consideration of risks in each relevant area of [their] operations, including:

(1) Employee training and management;

(2) Information systems, including network and software design, as well as information processing, storage, transmission and disposal; and

(3) Detecting, preventing and responding to attacks, intrusions, or other systems failures.

(c) Design and implement information safeguards to control the risks [they] identify through risk assessment, and regularly test or otherwise monitor the effectiveness of the safeguards' key controls, systems, and procedures.

(d) Oversee service providers, by:

(1) Taking reasonable steps to select and retain service providers that are capable of maintaining appropriate safeguards for the customer information at issue; and

(2) Requiring [their] service providers by contract to implement and maintain such safeguards.

(e) Evaluate and adjust [their] information security program in light of the results of the testing and monitoring required by paragraph (c) of this section; any material changes to [their] operations or business arrangements; or any other circumstances that [they] know or have reason to know may have a material impact on [their] information security program."

*Id*.

### Negative Consequences of Identity Theft

55.     In June 2007, the United States Government Accountability Office issued a report on Data Breaches, which can be found at http://www.gao.gov/new.items/d07737.pdf ("GAO Report"). That report indicated that "identity thieves can use financial account identifiers, such as credit card or bank account numbers, to take over an individual's existing accounts to make unauthorized charges or withdraw money." It additionally noted that thieves could also "use identifying data, which can include such things as SSNs and driver's license numbers, to open new financial accounts and incur

charges and credit in an individual's name, without that person's knowledge," and that this "form of identity theft is potentially the most damaging because, among other things, it can take some time before a victim becomes aware of the problem, and it can cause substantial harm to the victim's credit rating."

56.     The GAO Report additionally warned that victims of identity theft could face "substantial costs and inconveniences repairing damage to their credit records and their "good name." *Id.*

## CLASS ACTION ALLEGATIONS

57.     Plaintiff brings this action on behalf of a Class pursuant to Federal Rules of Civil Procedure 23(a), (b)(1), (b)(2), (b)(3), and (c)(4), on behalf of: a) all persons residing in the United States whose personal information was accessed and/or disclosed by unauthorized individuals in the data breach announced by Capital One on July 29, 2019 (the "Class"); and 2) all persons residing in the State of New York whose personal information was accessed and/or disclosed by unauthorized individuals in the data breach announced by Capital One on July 29, 2019 (the "New York Subclass") (collectively, the "Classes").

58.     Excluded from the Classes are: (i) Defendants Capital One and AWS, including any entity in which Defendants have a controlling interest, is a parent or subsidiary, or which is controlled by Defendants, as well as the officers, directors, affiliates, legal representatives, heirs, predecessors, successors, and assigns of Defendants; and (ii) the judges to whom this action is assigned and any members of their immediate families.

59.     The members of the Classes are so numerous that joinder of all members is impracticable.  The Classes includes approximately 100 million individuals whose personal information was compromised by the data breach.  Members of the Classes can be identified by the records retained by Defendants.

60.     There are various questions of law and fact common to Plaintiff and the Classes, including but not limited to the following:

- Whether Defendants engaged in the wrongful conduct alleged herein;

- Whether Defendants owed a duty to Plaintiff and members of the Classes to adequately protect their PII;

- Whether Defendants owed a duty to Plaintiff and members of the Classes to provide timely and accurate notice of the data breach;

- Whether Defendants negligently failed to implement and maintain commercially reasonable procedures to ensure the security of Plaintiff's and members of the Classes' PII;

- Whether Defendants breached their duties to Plaintiff and members of the Classes to adequately protect their PII;

- Whether Defendants breached their duties to Plaintiff and members of the Classes to timely and accurately provide notice of the data breach;

- Whether Defendants knew or should have known that their computer systems were vulnerable to cyber-attack;

- Whether Defendants' conduct, including its failure to act, was the proximate cause of the data breach;

- Whether Defendants' actions and/or failures to act were the proximate cause of harm to Plaintiff and members of the Classes;

- Whether Plaintiff and members of the Classes suffered injury as a result of Defendants' conduct or failure to act; and

- Whether Plaintiff and members of the Classes are entitled to damages, restitution, and/or equitable relief.

61.     Plaintiff's claims are typical of the claims of the Classes. Plaintiff applied for, and received, a credit card from Capital One in the applicable time period announced by Capital One (2005 through early 2019) and, as a result, he has reason to believe that his PII was comprised in the

data breach.  Therefore, Plaintiff is no different in any material respect from any other members of the Classes, and the relief sought by Plaintiff is common to the relief sought by the Classes.

62.    Plaintiff is an adequate representative of the Classes because his interests are neither antagonistic to, nor in conflict with, the interests of members of the Classes he seeks to represent, and he has retained counsel competent and experienced in conducting complex class action litigation. Plaintiff and his counsel will adequately protect the interests of the Classes.

63.    A class action is superior to other available means for the fair and efficient adjudication of this dispute.  Plaintiff and members of the Classes have been harmed by Defendants' actions and inactions.  The damages suffered by each individual members of the Classes are relatively small while the burden and monetary expense needed to individually prosecute this case against Defendants is substantial.  Thus, it would be virtually impossible for members of the Classes individually to redress effectively the wrongs done to them.  Absent a class action, Defendant will retain the benefits of its wrongdoing despite its serious violations of the law.  Moreover, even if members of the Classes could afford individual actions, a multitude of such individual actions still would not be preferable to class wide litigation.  Individual actions also present the potential for inconsistent or contradictory judgments, which would be dispositive of at least some of the issues and hence interests of the other members not party to the individual actions, would substantially impair or impede their ability to protect their interests, and would establish incompatible standards of conduct for the party opposing the class.

64.    By contrast, a class action presents far fewer litigation management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.  Also, or in the alternative, the Classes may be certified because Defendants have acted or refused to act on grounds generally applicable to the Classes, thereby making preliminary and final

injunctive relief and corresponding declaratory relief appropriate.  Also in the alternative, the Classes may be certified with respect to particular issues.

## FIRST CAUSE OF ACTION
**Negligence (on Behalf of Plaintiff and the Classes Against Defendants)**

65.     Plaintiff hereby incorporates the foregoing paragraphs of this Complaint and restates them as if they were fully written herein.

66.     By accepting Plaintiff's and members of the Classes' PII, Defendants assumed a duty to use reasonable care in retaining, maintaining, securing, and safeguarding such PII from being compromised, stolen, accessed, or misused by unauthorized persons.

67.     Defendants breached their duty of care owed to Plaintiff and members of the Classes by failing to adequately secure and protect Plaintiff's and Members of the Classes' PII from being compromised, stolen, accessed, or misused by unauthorized persons, as described in this Complaint.

68.     Defendants breached their duty of care owed to Plaintiff and members of the Classes by failing to timely discover that Plaintiff and members of the Classes' PII was being accessed by unauthorized persons.

69.     Defendants breached their duty of care owed to Plaintiff and Members of the Classes by failing to timely and accurately inform Plaintiff and members of the Classes that their PII had been compromised, stolen, accessed, or misused by unauthorized persons, as described in this Complaint.

70.     As a direct and proximate result of Defendants' failures to adequately protect Plaintiff's and members of the Classes' PII placed in their care, failure to timely determine that Plaintiff's and members of the Classes' PII was being accessed by unauthorized persons, and failure to timely and adequately notify Plaintiff and members of the Classes about the data breach, Plaintiff and members of the Classes were injured in fact.  Such injuries include, *inter alia*, identity theft, damage to credit scores, time and expense related to finding fraudulent accounts, monitoring their

identity, monitoring tax filings, nuisance and annoyance dealing with all of the issues resulting from the data breach, and costs associated with the loss of productivity from time ameliorating the actual and future consequences of the data breach, and the real and impending future risk of the foregoing.

## SECOND CAUSE OF ACTION

### Violation of New York's General Business Law § 349(a))
### (on Behalf of Plaintiff and the New York Subclass Against Defendants)

71.   Plaintiff hereby incorporates the foregoing paragraphs of this Complaint and restates them as if they were fully written herein.

72.   In violation of § 349 of New York's General Business Law ("GBL"), Plaintiff and New York Subclass members were subjected to Defendants' unfair or deceptive acts or practices by failing to properly implement adequate security measures that comport with industry standards to protect their PII.

73.   Defendants willfully ignored the readily apparent risk of a security breach of their data systems and failed to create, implement, and maintain reasonable security measures to prevent, detect, and mitigate the breach.

74.   Defendants benefitted from their decision not to implement proper preventative measures that would have prevented, detected, and mitigated the breach.

75.   Defendants' failure to create, implement, and maintain reasonable security measures was the direct and proximate cause, and continuing cause, of substantial injury to Plaintiff and New York Subclass members.

76.   Defendants' acts and omissions are and were against public policy and are and were unethical, deceptive, unfair, and oppressive.  Furthermore, they caused and will continue to cause substantial injury to consumers, including Plaintiff and New York Subclass members.

77.     As a direct result of Defendants' conduct described in this Complaint, Plaintiff and members of the New York Subclass have suffered actual and ascertainable losses, including improper disclosure of PII, loss in value of their PII, time and money lost due to taking efforts to mitigate and remediate the effects of the breach, including but not limited to the increased and imminent threat of identity theft that resulted and that Plaintiff and New York Subclass members continue to face.

78.     As a proximate and direct result of Defendants' failure to create, implement, and maintain security protocols that comport with industry standards, Plaintiff and members of the New York Subclass have been placed at immediate and substantial risk of harm of their PII being exploited and their privacy being invaded by unauthorized third parties.

79.     The injuries suffered by Plaintiff and New York Subclass members were directly and proximately caused by Defendants' violations of GBL § 349 entitling Plaintiff and the New York Subclass to an award of their actual damages or statutory damages of $50.00 per person, whichever is greater.  Moreover, Defendants' actions were carried out with such reckless indifference toward the rights of Plaintiff and New York Subclass members that an award of punitive and/or treble damages is appropriate.

80.     Accordingly, Plaintiff, on behalf of himself and other members of the New York Subclass, seeks to recover actual damages or $50.00 per person, whichever is greater, three times actual damages and/or punitive damages, and reasonable attorneys' fees and costs.

### THIRD CAUSE OF ACTION
**Breach of Contract (On behalf of Plaintiff and the Classes Against Capital One)**

81.     Plaintiff hereby incorporates the foregoing paragraphs of this Complaint and restates them as if they were fully written herein.

82.     Capital One entered into contracts with Plaintiff and Members of the Classes in which Capital One materially represented that it would provide certain services to them, in exchange for

valuable consideration (including, but not limited to, fees).  Furthermore, as an additional provision of such contracts, Capital One represented to Plaintiff and Members of the Classes that it would comply with applicable federal laws (including the GLBA) and regulations, state laws, and other applicable laws and standards by protecting their PII.

83.     Defendants breached their contractual duties to Plaintiff and Members of the Classes by failing to adequately secure and protect Plaintiff's and Members of the Classes' PII from being disclosed, compromised, stolen, accessed, or misused by unauthorized persons, as described in this Complaint.

84.     Defendants breached their contractual duties owed to Plaintiff and Members of the Classes by failing to timely discover that Plaintiff and Members of the Classes' PII was being accessed by unauthorized persons.

85.     Defendants breached their contractual duties to Plaintiff and Members of the Classes by failing to timely and accurately inform Plaintiff and Members of the Classes that their PII had been compromised, stolen, accessed, or misused by unauthorized persons, as described in this Complaint.

86.     As a direct and proximate result of Defendants' failures to adequately protect Plaintiff's and Members of the Classes' PII placed in their care, failure to timely determine that Plaintiff's and Members of the Classes' PII was being accessed by unauthorized persons, and failure to timely and adequately notify Plaintiff and Members of the Classes about the data breach, Plaintiff and Members of the Classes have sustained actual damages.

**PRAYER**

Plaintiff, on behalf of himself and members of the Classes, requests that the Court order the following relief and enter judgment against Defendants as follows:

A.     An order certifying that this action is properly brought and may be maintained as a class action, that Plaintiff Alexander Hun be appointed Class Representative for the Classes, and that Plaintiff's counsel be appointed Class Counsel.

B.     Awarding compensatory damages in an amount determined at trial for each Cause of Action asserted herein for which these damages are available.

C.     Awarding statutory damages in an amount determined at trial for each Cause of Action asserted herein for which these damages are available.

D.     Awarding punitive damages and/or treble in an amount determined at trial for each Cause of Action asserted herein for which these damages are available.

E.     Awarding restitution in an amount determined at trial for each Cause of Action asserted herein for which this relief is available.

F.     An order enjoining Defendants from continuing the unlawful practices described throughout this Complaint.

G.     An order directing Defendants to identify, with Court supervision, victims of its conduct and provide them equitable relief including: (i) credit monitoring; (ii) identity theft insurance; (iii) credit repair services; (iv) an ongoing claims resolution facility providing a procedure for victims to obtain redress for identity theft; and (v) monetary restitution.

H.     An order awarding Plaintiff his costs of suit, including reasonable attorneys' fees and pre and post-judgment interest, as provided by law, equity or as otherwise available.

I.     Such other and further relief as may be available as part of the statutory claims asserted herein, or otherwise as may be deemed necessary or appropriate for any of the claims asserted.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all causes of action and/or issues so triable.

DATED: August 1, 2019                    Respectfully Submitted,

                                         /s/ Joseph N. Kravec, Jr.
                                         Joseph N. Kravec, Jr.
                                         NY BAR #5491915
                                         **FEINSTEIN DOYLE PAYNE**
                                         **& KRAVEC, LLC**
                                         429 Fourth Avenue
                                         Law & Finance Building, Suite 1300
                                         Pittsburgh, PA 15219
                                         Tel.: (412) 281-8400
                                         Fax: (412) 281-1007
                                         Email: jkravec@fdpklaw.com

                                         *ATTORNEYS FOR PLAINTIFF*
                                         *AND THE PROPOSED CLASSES*